# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

ANTHONY F. DURAN,

         Applicant,

v.                                       CV 10-0884 MCA/WPL

JAMES JANECKA,

         Respondent.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

In July of 1997, a jury convicted Anthony F. Duran on six counts arising out of a crime that occurred on July 13, 1996. After all relief was denied in several post-conviction proceedings at the state level, Duran filed an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 1.) After a careful review of the record and the pleadings, I conclude that Duran has submitted a mixed petition containing both exhausted and unexhausted claims. I further conclude that a stay to allow Duran to exhaust all of his claims is not warranted. Thus, I recommend that Duran amend his petition to delete the unexhausted claims or, in the alternative, that the Court dismiss this petition without prejudice to allow Duran to raise his unexhausted claims in state court.

### FACTUAL AND PROCEDURAL BACKGROUND

On the morning of July 13, 1996, a man wearing women's clothing and a mask that partially covered his face entered the unlocked home of Sheryl Fumerola and her ten-year-old son in Alamogordo, NM. T5:328-455.[1] Mrs. Fumerola and her son were home at the time, and, when Mrs.

---

[1] The trial was recorded on seventeen cassette tapes, each of which is numbered, and no written transcript was provided. To denote the citation for the portions of the transcript discussed, I will cite to the tape ("T"), the number of the tape (1-17), and the time stamp listed on the tape recorder and player (00-550).

Fumerola saw the man, she immediately noticed that he had a gun. T5:346-49. He instructed her to make her son stay in his room, to walk into the office of her home, and to undress. T5:352-408. After she was almost entirely undressed, wearing only her underwear and holding her bra over her chest, her son opened his door, and the man ordered her to put him in the bathroom. T5:408-15. When Mrs. Fumerola left the office to get her son, she told him to run, and they ran out of the house together. T5:438-55. A few neighbors saw and assisted the two victims; these same neighbors then saw a man running from the Fumerola residence and chased him down an alley. T6:467-525; T9:510-45.

Earlier that morning, around 8:30 a.m., Duran admittedly went to the Fumerola residence. He claimed to be looking for a friend, and he left when Mrs. Fumerola answered the door and advised him that no one by that name lived in the home. T5:292-308; T14:441-50. Duran was carrying a plastic grocery bag and a shoe box. T14:418-29. Mrs. Fumerola noticed Duran's heavy jacket and that the skin on his face appeared either scarred from a burn or severely pock-marked. T5:300-05. Based on that earlier interaction with Duran, Mrs. Fumerola identified him as the man who entered her home later that morning. T5:308, 489-507. A neighbor who saw the perpetrator run through the alley after the crime also identified Duran as the perpetrator. T10:136-199.

The police found Duran later that same morning sitting on the Hinkle family's porch. The Hinkles lived approximately .4 miles from the Fumerola residence, and the two homes are separated by an undeveloped desert area. T12:330-44. When found, Duran was wet and wearing shorts and a towel with no shirt or shoes. T9:395-411, 456-75.

There was a plethora of circumstantial evidence admitted at trial that connected Duran to the crime, most of which was found at the crime scene, in the desert area between the Fumerola and Hinkle homes, and in the room at the Alamo Inn that Duran had rented on July 12. Immediately

2

outside the Fumerola residence, Mrs. Fumerola found a shoe box covered in duct tape that was lying in her flower bed. T4:404-427. In that box was a receipt from a Chevrolet dealer to Theresa Duran and several letters. T4:458-76. The letters were sexually explicit and sometimes violent in nature. T15:88-98. In the alley through which the perpetrator ran, the police recovered several items. T6:495-532; T9:529-59; T10:136-222. These included a letter and two calling cards that belonged to Mrs. Fumerola, a Chinese exercise ball, and a leatherman tool in a case. T4:398; T5:477; T10:233-35, 320-70. Duran admitted that the ball and leatherman belonged to him. T14:424-29. Strewn around the desert area, the police found a plastic IGA bag, several homemade pieces of women's clothing, fabric, a blue and white cord, and pink material that was knotted with hair in the knot. T7:380-412; T7:548-T8:152. There were several items in the IGA bag, including a roll of duct tape, additional women's clothing, a clothespin, a plastic quick tie, and two Chinese balls. T7:419-523. Duran admitted that all of these items belonged to him. T15:105-155. In the room at the Alamo Inn, the police found a white and blue cord with wooden clothespins attached, pieces of lace on the floor, sewing materials, various pieces of colored fabric, homemade articles of clothing, two plastic quick ties, and duct tape affixed to the ceiling. T8:220-436.

The prosecution and defense stipulated that all writing found at the Alamo Inn, in Duran's sister's vehicle, and in the box was done by Duran. T9:144-360. A forensic microanalyst with the crime lab testified as to fabric, cord and hair comparisons. T11:500-T12:180. He testified that he compared some of the fabrics found in the Alamo Inn room to some fabrics found in the desert area, and each fabric analyzed from the desert area was identical to a fabric found in the room. T11: 395-439. He further testified that he compared the blue and white cord found in the desert area to that found in the room and that those were identical. T11:440-56. According to an officer and to Duran, those cords were tied in such a way as to be used for sexual gratification and were called "nipple

3

pulls." T12:470-80; T15:125-28. The microanalyst also did an examination of duct tape found at the scene and in the room but testified that it is not possible to link duct tape to one roll of tape. T11:510-549. He finally testified that he compared the hair found in the pink knotted fabric and on some pieces of duct tape to Duran's hair standard and found the hairs similar, making it highly unlikely that the hair on the fabric and tape came from someone else. T12:1-155. The perpetrator had duct tape individually wrapped around each finger. T5:446-48, 468. When Duran was arrested, he had a sticky substance on his fingernails, his box was wrapped in duct tape and duct tape was found in the plastic bag and in the room at the Alamo Inn. T7:246-49.

There were a few notable holes in the evidence that were brought out by Duran's counsel. No gun was ever recovered or admitted into evidence. Only partial fingerprints were found in the Fumerola home, and they could not be conclusively linked to Duran. T10:391-93, T13:530-540. While DNA can be extracted from hair, there was no detectible DNA found in the hair samples from the desert and the room. T12:163-80. Furthermore, there were no hair samples found at the crime scene. T12:161. Duran had a tattoo of a mushroom on his forearm, which he claimed that he had at the time of the crime, but no one identified him based on the tattoo. T14:314-21; T15278-84. Significantly, though, police policy is to record all tattoos during the booking process, and the officer who booked Duran did not see or write down the mushroom tattoo. T12:200-33.

During trial, Duran testified to his version of the morning's events. He stated that on the morning of July 13, around 7:45 or 8 a.m., he walked from the Alamo Inn to what he believed was his friend's home but was actually the Fumerola residence. T14:409-50. After he learned that his friend did not live there, he attempted to visit his friend Al Deery who lived across the street at around 9 a.m. T14:441-57. Because no one answered, he claimed that he left the items he was carrying under the bushes in front of Mr. Deery's home. T14:451-57. He walked approximately two

4

miles back to his sister's home from there, changed clothes, walked to a park about a mile from his sister's home, and got a ride back up to the area where he was found. T14:457-89. He said that he went to that area to see Mr. Hinkle, who he had met previously and who offered to bring Duran an application for a construction job. T14:482-495. He went to Mr. Hinkle's home, but no one answered the door. T14: 503-05. Because it was hot, he jumped the fence of another house and went swimming in their pool. T14:505-512. He then returned to Mr. Hinkle's house and sat on the porch, where he was found and arrested by the police. T14:512-31.

The police who encountered Duran at the Hinkle residence reported what Duran told them at the time and shortly thereafter. During the initial encounter between the police and Duran at the Hinkle residence, Duran first told them that he was at Mr. Hinkle's house to ask about a job and that he was dropped off at the residence by his sister. T13:70-78. Shortly thereafter, Duran said that he was dropped off by his sister to go swimming at another house and that he swam there for thirty minutes. T13:90-98. One officer spoke with Duran's sister and confirmed that she had not driven Duran anywhere that morning. T12:119. After he was in custody, Duran was interviewed on both July 13 and 15, and he told another somewhat different story. He claimed that he walked from the Alamo Inn to a park around 8 a.m. on the morning of July 13, a distance of 3.4 miles. T13:130-50, 345-54. He met a friend named Dennis at the park who said that he lived across the street from Mr. Deery. T13: 130-50, 355-59. During the July 13 interview, Duran reported that he walked from the park to the house where he believed Dennis lived, but, on July 15, he said that he got a ride from an unknown person at the park. T13:130-50, 360-62. He said that he got to the house around 9:30, knocked and was told by a woman that no one named Dennis lived there. T13:130-50, 374-78. Duran then reported walking across the street to Mr. Deery's, knocking, and getting no answer. T13:156-60. He then walked to his sister's house, approximately 2.2 miles from the Fumerola and

5

Deery residences, and then returned to the park by foot, another 1.1 miles. T13:160-63, 383-86. At the park, Duran claimed that he met an older man who drove him back across town to Mr. Hinkle's neighborhood. T13:164-66, 387-90.

After a two day jury trial, the jury found Duran guilty of kidnapping in violation of N.M. STAT. ANN. § 30-4-1(4) (1978), aggravated assault in violation of N.M. STAT. ANN. §§ 30-3-2(A), 13-18-16 (1978), aggravated burglary in violation of N.M. STAT. ANN. §§ 30-16-4(A), 13-18-16 (1978), tampering with evidence in violation of N.M. STAT. ANN. § 30-22-5 (1978), theft of a credit card in violation of N.M. STAT. ANN. § 30-16-26 (1978), and being a felon in possession of a firearm in violation of N.M. STAT. ANN. § 30-7-16(A) (1978). T17:238-74. Duran's attorney requested immediate sentencing prior to the completion of a Pre-Sentence Report. T17:390.

Judge Doughty sentenced Duran to the maximum penalty on each count, to be served consecutively. T17:428-41. *See also* Record Proper ("RP") at 288-90, 308-10. However, due to a mathematical error, Judge Doughty stated the total as twenty five and a half years rather than twenty seven years. After sentencing, the State filed a supplemental criminal information charging Duran as a habitual offender. RP at 277-78. After a hearing on the supplemental information, Judge Doughty enhanced Duran's sentence by twenty years, or by four years on five of the six counts, for a total of forty seven years of incarceration. RP at 352-54.

In an earlier order, I explained the post-trial relief sought by Duran and the grounds therefore. (*See* Doc. 16 at 2-3.) His appeals were eventually denied at all levels, as was his state petition seeking habeas corpus relief. *See* RP at 355-68, 413-32, 446-53, 459-60. On both the direct appeal and habeas review, the New Mexico Supreme Court summarily denied Duran's claims. (Doc. 11 Ex. P; Doc. 11 Ex. Y; Doc. 11 Ex. KK.)

## EXHAUSTION

To obtain federal review of a state conviction, an applicant is required to first exhaust all remedies available in state court. *See* 28 U.S.C. § 2254(b)(1)(A); *see also Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (citations omitted). To satisfy this requirement the applicant must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). This entails presenting the claim through all available levels on direct appeal[2] or through a full round of state post-conviction review.[3] *See id.* at 842-45; *Castille v. Peoples*, 489 U.S. 346, 350-51 (1989); 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE AND PROCEDURE §23.3b, at 1205-14 (6th ed. 2011). Exhaustion, however, is not a jurisdictional prerequisite; it is an affirmative defense that can be waived by the government through an express waiver. 28 U.S.C. § 2254(b)(3); *Granberry v. Greer*, 481 U.S. 129, 131 (1087).\

## I.      Potential Waiver of Exhaustion

In this case, in relation to exhaustion of claims, the State wrote the following:

10.     Respondents submit Petitioner has exhausted all claims by raising the claims before the state district court through the direct appeal process, the filing of a state habeas corpus petition, and before the New Mexico Supreme Court in a petition for writ of certiorari.

11.     Respondents do not expressly waive the exhaustion requirement.

---

[2] New Mexico has a two-tiered appellate system for most cases in which a direct appeal lies with the state court of appeals and discretionary review rests with the state supreme court. *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 814 n.20 (10th Cir. 1995).

[3] A full round of state post-conviction review includes all procedures that are an "established part" of the state's post-conviction review process. *O'Sullivan*, 526 U.S. at 845. In New Mexico, it is clearly established that an appeal to the New Mexico Supreme Court is available from the denial of a writ of habeas corpus. NMRA 5-802 (2009); *see also Smith*, 50 F.3d at 820, 821. Thus, an appeal from the denial of a writ is an established part of the state habeas corpus proceeding, and so it must be taken to complete the full round of state post-conviction review.

(Doc. 11 at 11 (citation omitted).) Despite the State's submission, my review of the record demonstrated that four of the twelve claims of error raised by Duran in his petition had not been exhausted because they were never raised in Duran's petitions to the New Mexico Supreme Court for a writ of certiorari. (*See* Doc. 16 at 2-3, 5; *see also* Doc. 11 Ex. O; Doc. 11 Ex. X; Doc. 11 Ex. II.) Specifically, those unexhausted claims include: (1) ineffective assistance of trial counsel after the plea proceedings; (2) nondisclosure of favorable evidence; (3) illegal search and seizure; and (4) custodial statements obtained in violation of the Fifth Amendment.[4] (*See* Doc. 16 at 5.) Thus, I concluded that Duran presented a petition with both exhausted and unexhausted claims, or a mixed petition. (Doc. 16 at 1, 4-5.) Because the State expressly preserved the exhaustion defense, I ordered supplemental briefing on the issue of exhaustion. (Doc. 16.) In the State's supplemental brief, it unsurprisingly admitted that its "submission that the claims were exhausted was incorrect . . ." and "agree[d] that the Petition is a mixed petition." (Doc. 21 at 2.)

Before proceeding, I must consider a recent, unpublished Tenth Circuit decision that could indicate that the State in this case waived the defense of exhaustion. *See Richwine v. Romero*, No. 10-2247, 2011 WL 2066552 (10th Cir. May 26, 2011) (unpublished). There, the State originally filed an answer arguing that twelve of the twenty-three errors had not been exhausted. *Id.* at *1. However, after receipt of the entire state court record, the State filed a supplemental answer stating that "[the State] submits [Defendant] has exhausted his issues . . ." but it did "not waive any other defenses or other objections to any claims raised in the Petition . . . ." *Id.* at *2. The district court

---

[4] Upon my initial review, I found that five claims were not exhausted. (Doc. 16 at 5.) The one not listed above, that the prohibition against double jeopardy was violated when Duran's sentence was enhanced on five counts because he was found to be a habitual offender, was not included in his federal habeas petition. (*See id.*; Doc. 1.) While Duran did make that claim in his original state habeas application, he did not reassert it before this Court.

concluded that four issues had not been exhausted, that the State had not waived the defense, and that the application should be dismissed without prejudice if the Defendant would not amend his application to remove the unexhausted claims. *Id.* The Tenth Circuit reversed the decision on the basis that the State had expressly waived the exhaustion requirement. *Id.* at *3-4. As evidence of waiver, the court considered the language used in the supplemental answer as well as the request in the supplemental answer that the petition be dismissed with, rather than without, prejudice. *Id.* at *3.

Unlike in *Richwine*, the State here stated expressly and with specificity that it did not waive the exhaustion requirement. While the State did request dismissal with prejudice, clearly contemplating that the Court would review and reject the petition on the merits, that is not dispositive. Courts may consider and dismiss unexhausted or mixed petitions with prejudice when all claims clearly lack merit. *See* 28 U.S.C. § 2254(b)(2). Moreover, in this case, the parties have had an opportunity to further address exhaustion, and the State has now affirmatively asserted exhaustion as a defense. Given the more specific language used by the State and the procedural posture of this case, I find that *Richwine* is distinguishable. Accordingly, I find that Duran has presented a mixed petition and that exhaustion has not been waived.

However, I note that the State of New Mexico commonly concedes exhaustion but includes language to preserve the defense. This creates additional work for the federal courts in evaluating whether the exhaustion requirement has been met, delays the proceedings while the court waits for and reviews the state court record, and presents a difficult legal question regarding waiver. I discourage the State from resorting to such tactics in the future.

Duran recognizes that his petition is mixed, but he requests that I nonetheless consider all of his claims on their merits. To do so, I must find that (a) an exception applies, (b) a stay is

warranted, or (c) none of the claims are potentially meritorious. *See* 28 U.S.C. § 2254(b)(1)(B); *Rhines v. Weber*, 544 U.S. 269, 274-78 (2005).

## II.    Exceptions to Exhaustion

Exceptions to the exhaustion requirement are very limited. There must be either no available state corrective process or circumstances that would render the available process ineffective to protect Duran's rights. *See* 28 U.S.C. § 2254(b)(1). In New Mexico, there is no statute of limitations on habeas petitions, so Duran may file a state habeas petition raising his unexhausted claims. *See State v. Sutphin*, 164 P.3d 72, 76 (N.M. 2007). Thus, because it is "not at all clear" that the state court would hold the claim procedurally barred, the first exception does not apply. *See Barnett v. Hargett*, 174 F.3d 1128, 1135 (10th Cir. 1999).

The second exception, that the state court process would be ineffective or futile, is most compelling where the question is one of pure law and the circumstances of the individual case are largely irrelevant. *Noltie v. Peterson*, 9 F.3d 802, 806 (9th Cir. 1993). However, "[a petitioner] may not bypass the state courts simply because he thinks they will be unsympathetic to the claim." *Engle v. Isaac*, 456 U.S. 107, 130 (1982). Here, Duran's unexhausted claims are intimately tied to the facts, and Duran's belief that the State will be unsympathetic does not render the process futile. The futility exception does not apply.

Duran's argument for an exception to exhaustion is not based on either of the two statutory exceptions; rather, he argues that an exception is warranted based on the unjustified delays he experienced during his state habeas proceedings. (Doc. 20 at 1-2.) While such an exception has been recognized in some challenges to custody, *see, e.g.*, *Gonzalez v. O'Connell*, 355 F.3d 1010, 1016 (7th Cir. 2004) (petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241), judicial discretion is not available under 28 U.S.C. § 2254. Here, Congress clearly mandated exhaustion

when it is not waived by the state unless specific exceptions apply, so the courts do not have discretion to balance the competing interests and determine whether the exhaustion of remedies should be required. *McCarthy v. Madigan*, 503 U.S. 140, 144-46 (1992), *superseded on other grounds*, 42 U.S.C. § 1997(e).

### III.    Stay-and-Abeyance

Both Duran and the Respondents request that, if the Court does not proceed to the merits, the application be stayed in abeyance pending state court review of Duran's unexhausted claims. (Doc. 20 at 2; Doc. 21 at 7.) Because granting a stay effectively excuses a petitioner from failing to properly exhaust his claims, a stay is only justified in limited and unique circumstances. *Fairchild v. Workman*, 579 F.3d 1134, 1153 n.9 (10th Cir. 2009). A stay is only available "if the petitioner had good cause for his failure to exhaust, his unexhausted claims are potentially meritorious, and there is no indication that the petitioner engaged in intentionally dilatory litigation tactics." *Rhines*, 544 U.S. at 278. Duran could likely show good cause, and there is no indication that he engaged in dilatory tactics. The key issue of the inquiry, then, is whether any of his unexhausted claims are potentially meritorious. If they are not, a stay is inappropriate and the court must instead "allow the petitioner to delete the unexhausted claims and to proceed with the exhausted claims if dismissal of the entire petition would unreasonably impair the petitioner's right to obtain federal relief." *Id.* For the reasons detailed below, none of Duran's unexhausted claims are potentially meritorious, so a stay is not warranted.

#### 1.    Potential Merit of Fourth Amendment Claim

Duran has raised an unexhausted claim based on an alleged violation of his Fourth Amendment rights, and the State argues that the Court may not consider this claim based on *Stone v. Powell*, 428 U.S. 465 (1976). (Doc. 21 at 6.) In *Stone*, the Supreme Court held that a federal court

may not grant habeas relief to a state prisoner on the ground that evidence was obtained in an unconstitutional search or seizure so long as the state "provided an opportunity for full and fair litigation" of the claim. 428 U.S. at 494. However, the issue at this stage is whether a state court could find Duran's Fourth Amendment claim meritorious, not whether it is properly presented to the federal court.

Duran argues that the consent that he gave the police to search his motel room was invalid because, at the time he signed the consent form, the form only indicated that the police were looking for a gun and clothing used in the burglary. (Doc. 1 at 40.) He asserts that the form was later amended to include omnibus language about anything else needed in the investigation. (*Id.*)

First of all, Duran likely lacks standing to challenge the search because he had rented the motel room for a night and the rental period had lapsed by the time the search occurred. *United States v. Croft*, 429 F.2d 884, 887 (10th Cir. 1970) ("When the rental period [for a motel room] has elapsed, the guest has completely lost his right to use the room and any privacy associated with it."). However, even assuming that he did have standing and assuming that the form was altered, the search was within the scope of Duran's consent. A search's scope "is generally defined by its expressed object[,]" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991), and an objective reasonableness test applies to measure the scope of a person's consent. *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004) (citations omitted). Where a person consents to a search for particular items, that consent necessarily includes consent to search those areas or containers that might reasonably contain those items. *Id.* (citing *Jimeno*, 500 U.S. at 251; *United States v. Wacker*, 72 F.3d 1453, 1470 (10th Cir. 1995)). Thus, the police had authority to search any containers in the room that could have contained a gun or clothing and authority to seize any evidence of criminal activity found in the authorized search area. There is no potential merit to this claim.

2.      *Potential Merit of Fifth Amendment Claim*

Another unexhausted claim is based on the Fifth Amendment. Duran claims that his Fifth Amendment rights were violated because he was intoxicated, under the influence of drugs, and mentally disoriented when he spoke to the police. Duran spoke with police after being appraised of his *Miranda* rights, and he does not contest that he consented to waive those rights in order to speak to the police. (Doc. 1 at 41.) *See also* RP at 31; T13:124-30, 330-45.

To safeguard the Fifth Amendment privilege against self-incrimination, the Supreme Court requires that police inform a suspect of his *Miranda* rights prior to subjecting him to custodial interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). Of course, a suspect may waive those rights and speak with the police, but such a waiver must be voluntary, knowing, and intelligent. *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (quoting *United States v. Morris*, 287 F.3d 985, 988 (10th Cir. 2002)). Whether this standard is met depends on the totality of the circumstances, a heavily fact-specific inquiry. *Id.* at 1256-57 (citations omitted). The standard is generally met where the individual understood the significance of his decision and the consequences thereof. *Id.* at 1257 (citations omitted). The mere fact of drug or alcohol use is insufficient to show involuntariness; the Tenth Circuit has approved of *Miranda* waivers so long as the intoxicated person appeared alert and able to answer questions at the time of the custodial interrogation. *See United States v. Curtis*, 344 F.3d 1057, 1065-66 (10th Cir. 2003) (finding valid waiver where the police officer testified that the defendant, who was under the influence of marijuana, crack cocaine, and alcohol, was calm and able to answer questions even though he laid his head on the table during the interview and closed his eyes at times); *Morris*, 287 F.3d at 988-89 (concluding waiver by a person with gunshot wounds who was in the hospital and under the effects of pain medication was valid because officers testified that he was alert, responsive and coherent).

13

Instead, a defendant must show through evidence that his condition rose to the level of substantial impairment. *Burson*, 531 F.3d at 1258.

Here, Duran contends that his waiver was involuntary or unknowing because of his level of intoxication and disorientation. However, ample evidence from the trial demonstrated that Duran coherently responded to questions both pre- and post-arrest. Moreover, to support another claim, Duran has argued that he was sufficiently aware and intelligent when he signed the consent to search form, which he signed during custodial interrogation, to know that he did not want to give the police unfettered authority to search his motel room. (Doc. 1 at 40 ("[T]here is no way he would have signed such a vauge [sic] consent to search.").) By arguing that he was so aware when presented with the consent form, Duran has undercut his allegation that he was substantially impaired when talking to the police. Based on the totality of the circumstances from the evidence adduced at trial and Duran's own habeas application, I find that no State court could conclude that Duran's impairment was substantial enough to invalidate the waiver of his *Miranda* rights.

### 3.    *Potential Merit of Failure to Disclose Evidence Claim*

Duran's unexhausted claim that favorable evidence was not disclosed also lacks merit. Duran's counsel was denied access to attorney notes in the prosecution's file, which Duran believes could have revealed that District Attorney Scott Key, who had been Duran's defense attorney in an earlier prosecution, was in fact participating in the prosecution and trial at issue here. (Doc. 1 at 35-36.)

The right to obtain favorable evidence stems from the due process clause of the Fifth Amendment and the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83 (1963). *United States v. Agurs*, 427 U.S. 97, 103-108 (1976). However, the evidence must be material to the defendant's guilt or to the punishment to implicate the Constitution. *Brady*, 373 U.S. at 87; *United*

14

*States v. Bagley*, 473 U.S. 667, 678 (1985). In this case, any evidence related to a possible conflict of interest between Duran and the District Attorney's office is neither material nor relevant to Duran's guilt and punishment.[5] None of Duran's constitutional or federal rights were violated by the denial of access to this material.

### 4.      *Potential Merit of Ineffective Assistance Claim*

Duran's final unexhausted claim is based on ineffective assistance of his counsel, Edward L. Benavidez, at trial. Duran alleges a number of ways in which his counsel was ineffective, including that counsel had Duran present false testimony that he was a homosexual and that counsel did not have a strategy, communicate extensively with Duran prior to trial, inform Duran of some witnesses and their testimony, adequately investigate the case, file motions to suppress, impeach witnesses at trial, and file a timely appeal. (Doc. 1 at 10-22.)

To succeed on an ineffective assistance of counsel claim, Duran must proceed through a two-prong inquiry. First, he must show that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). This requires a showing that the performance is "completely unreasonable, not simply wrong." *Fox v. Ward*, 200 F.3d 1286, 1295 (10th Cir. 2000) (citing *Hoxsie v. Kerby*, 108 F.3d 1239, 1246 (10th Cir. 1997)). Judicial scrutiny of counsel's performance is highly deferential, and courts apply a strong presumption that the attorney acted within the range of "reasonableness." *Harrington v. Richter*, 131 S. Ct. 770, 778 (2011); *Strickland,* 466 at 689. At the second prong, Duran must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to

---

[5]  Moreover, the trial judge reviewed the State's file and found nothing in the file about Scott Key. RP at 384.

undermine confidence in the outcome. *Id*. A court may resolve an ineffective assistance claim on either performance or prejudice grounds, so the court need not consider both prongs if the claim will clearly fail on one. *Fox*, 200 F.3d at 1295.

Based on the evidence presented by the State at trial, even assuming that Duran's counsel's performance fell below the standard of reasonableness, Duran was not prejudiced. Two eyewitnesses, the victim and a neighbor, identified Duran as the perpetrator. In addition, extensive circumstantial evidence connected Duran to the crime. Much of the evidence found in the alley near the Fumerola residence and in the desert area between the Fumerola and Hinkle homes belonged to Duran or was identified as belonging to him based on similar items found in Duran's motel room or Duran's hair sample. Letters of a sexual nature and tools for sexual gratification were found at the scene, in the desert area, and in the motel room. The sticky residue that police saw on Duran's fingernails implied that he had covered his fingertips with duct tape. Finally, the story that he told the jury about how he spent the morning of July 13 was both inconsistent with prior versions and inherently unbelievable, given the immense distance that he claimed to have walked over the course of just a couple of hours. Duran himself admitted the strength of the evidence against him in his state habeas corpus proceedings. (Doc. 11 Ex. EE at 11-16; Doc. 11 Ex. II at 4 ("There was a plethora of evidence in this case linking Mr. Duran to the crimes charged.").) Because of the clear evidence indicating Duran's guilt, he was not prejudiced by any of counsel's pretrial investigation and communication or the manner in which counsel conducted the trial.

Duran was also not prejudiced by his counsel's failure to file motions to suppress. First of all, as discussed above, any Fourth Amendment claim lacks merit, so Duran was not prejudiced by his counsel's failure to contest his consent to the search. *See supra*, pp. 12-13. Secondly, Duran was not prejudiced by the failure to file motions to suppress the out of court identifications by the victim

16

and neighbor because there is no indication that the identifications were unreliable. Out-of-court identifications violate due process if they are unnecessary, suggestive, and unreliable; even if the procedure was unnecessary and suggestive, though, the resulting testimony is admissible so long as the identification was still reliable in light of the totality of the circumstances. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 116 (1977). Here, the victim had the opportunity to view the perpetrator before and during the crime in daylight and in her home for more than a few minutes, she had previously met the perpetrator that morning, she was paying rapt attention to the perpetrator, her description of the perpetrator was accurate, she was certain of his identity during the identification, and mere hours passed between the crime and the initial identification. *See id.* at 114-16; *Neil v. Biggers*, 409 U.S. 188, 200-01 (1972). All of the same is true of the neighbor except that he did not know Duran previously, and he only briefly saw the perpetrator's full face in daylight immediately following the crime. *See* RP at 34.

Finally, Duran was not prejudiced by counsel's failure to file a timely docketing statement because he was still allowed to appeal and all of his issues were heard. Based on the foregoing, there is no possibility that the New Mexico court would find Duran's claim based on ineffective assistance of counsel at trial meritorious.

## IV.    Merits of Exhausted Claims

Finally, I must determine whether Duran's exhausted claims clearly lack merit, requiring the dismissal of his petition, or whether the other claims warrant an evidentiary hearing. The court may only deny a mixed petition on the merits when it is completely clear that the applicant has not raised a colorable federal claim. *Hoxsie*, 108 F.3d at 1243. The Supreme Court recently held that evidentiary hearings may not be conducted in many cases brought pursuant to 28 U.S.C. § 2254 because federal court review "is limited to the record that was before the state court that adjudicated

17

the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). In *Cullen*, the Supreme Court considered the record that is available to a federal court when it considers whether the state court's decision was contrary to or an unreasonable application of clearly established law. *Id.* Presumably, then, the federal court may expand the record pursuant to a hearing only when the state court's adjudication of a claim resulted in a decision that was based on an unreasonable determination of the facts.

Beginning with Duran's claim of ineffective assistance of counsel at the plea negotiation stage, I find that this is a potentially meritorious claim. Currently, two cases based on the ineffective assistance of counsel prior to trial are pending before the Supreme Court. In those cases, the Court will decide whether pre-trial ineffective assistance of counsel resulting in the rejection of a plea agreement is a viable claim and, if so, the remedy that federal courts may impose. *Missouri v. Frye*, 131 S. Ct. 856 (2011); *Lafler v. Cooper*, 131 S.Ct. 856 (2011). However, the Tenth Circuit and several other courts have concluded that it is possible to sustain a claim of ineffective assistance of counsel where counsel failed to sufficiently advise his client, the client rejected a plea bargain that he otherwise would have taken, and the client was prejudiced as a result. *Julian v. Bartley*, 495 F.3d 487, 497-500 (7th Cir. 2007); *Satterlee v. Wolfenbarger*, 453 F.3d 362, 370 n.7 (6th Cir. 2006); *United States v. Merritt*, 102 F. App'x 303, 307 (4th Cir. 2004) (unpublished); *Nunes v. Mueller*, 350 F.3d 1045, 1052-53 (9th Cir. 2003); *Wanatee v. Ault*, 259 F.3d 700, 703-04 (8th Cir. 2001); *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999); *United States v. Gordon*, 156 F.3d 376, 379-82 (2d Cir. 1998); *United States v. Gaviria*, 116 F.3d 1498, 1512-13 (D.C. Cir. 1997); *United States v. Carter*, 130 F.3d 1432, 1441-42 (10th Cir. 1997); *Teague v. Scott*, 60 F.3d 1167, 1170-71 (5th Cir. 1995)). Thus, a claim based on ineffective assistance of counsel during plea negotiations is available.

I must decide, then, whether Duran can meet the two-prong *Strickland* test. Duran claims that he was offered a sentence of twenty years in return for a guilty plea prior to trial. Assuming that is true, the difference between the plea bargain and the post-trial sentence would be twenty-seven years, which would clearly satisfy the prejudice prong. There is no record as to the plea bargain, whether Duran would have taken the plea, or counsel's performance during the plea negotiations. Here, though, because the state court's adjudication regarding this issue was based on an incorrect determination of the facts, an evidentiary hearing is warranted to further develop the record. Specifically, the New Mexico District Court concluded that Duran was not prejudiced by any alleged errors in the plea process because the total sentence received was twenty five years, only five years more than the negotiated sentence. However, Duran actually received a sentence of twenty seven years, the maximum possible penalty, which was subsequently enhanced by twenty additional years. Since the sentence differential evidences prejudice and there is no record related to Duran's willingness to plead guilty or counsel's performance at the plea stage, I cannot summarily reject Duran's ineffective assistance of counsel claim. An evidentiary hearing is necessary to determine whether counsel performed below objective standards of reasonableness by failing to advise Duran of the strength of the State's case against him.

## CONCLUSION

Duran has presented several separate claims for relief under 28 U.S.C. § 2254. While most of those claims have been exhausted in state court and are properly presented to this Court, four claims were not exhausted. Though the State originally conceded exhaustion, it affirmatively maintained that it did not waive the defense. Upon review by this Court and supplemental briefing, the State invoked the defense of exhaustion. Since the four claims were not presented to the New Mexico Supreme Court either on direct appeal or in the state habeas corpus proceedings, they are

19

unexhausted. These unexhausted claims are not potentially meritorious, so a stay to allow Duran to exhaust them would be inappropriate.

Because Duran has presented a mixed petition and because the unexhausted claims are not meritorious, I recommend that the Court allow Duran the opportunity to amend his federal petition to delete the unexhausted claims. Based on the length of the petition and the effort that would be required to amend the petition, I recommend that the Court not allow Duran to resubmit the entire petition as amended. Instead, I recommend that the Court instruct Duran to submit a one-page document stating that he has amended his petition to delete the unexhausted claims. If this recommendation is adopted by the District Court and if Duran amends his petition, I will appoint counsel for Duran and schedule an evidentiary hearing.

Of course, Duran may choose to return to state court to present his unexhausted claims. However, doing so will result in the dismissal of his federal habeas petition without prejudice. Should he decide to take this route, given the time that has elapsed, it is likely that all of his claims, even those that are exhausted, would be time-barred upon his return to federal court.

IT IS THEREFORE RECOMMENDED THAT:

1) Duran's claims of ineffective assistance of counsel at trial, invalid consent to search, unknowing and unintelligent waiver of the Fifth Amendment, and failure to disclose favorable evidence be found unexhausted and his federal petition "mixed";

2) If these proposed findings are adopted, Duran be ordered to file a one-page certification stating that he elects to delete his unexhausted claims within thirty (30) days of District Judge Armijo's order, if he so chooses; and

3) If these proposed findings are adopted, Duran be advised that failing to file a certificate

amending his petition within thirty (30) days could result in the dismissal of his petition and the

expiration of the one-year statute of limitations.

> **THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any *pro se*
party as they are shown on the Court's docket.